(75 South. 107)

No. 20880.

MARZETTE et al. v. CRONK et al.

(April 16, 1917.)

*(Syllabus by the Court.)*

1. EVIDENCE ⬸331 — AUTHENTICATION OF FOREIGN STATUTES — FEDERAL AND STATE LAW.

There is nothing in the acts of Congress providing the manner in which the acts of a state Legislature shall be authenticated which deprives a state of the power to declare that the statutes of another state shall be admissible in evidence, as published in book form, and that the book shall make prima facie proof of its contents.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1235, 1236.]

2. MARRIAGE ⬸16, 40(4)—SLAVES—PRESUMPTIONS—LEGITIMACY OF CHILDREN.

Where two negroes are shown to have lived together, while slaves in another state, as man and wife, and to have so held themselves out to the public and have so been recognized, and to have reared children whom they recognized as their own and whom the public so recognized, and where those relations were continued after the abolition of slavery and after the parties came to this state, until the death of the man, the courts of this state, in the absence of any shown impediment, will presume a marriage between such man and woman and the lawful filiation of the children, and a fortiori is that the case where it appears that, under the law of the state a quo, they were accorded the marital status and their children were legitimated by reason of their living together as husband and wife.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 7, 61, 62.]

Appeal from First Judicial District Court, Parish of Caddo; John R. Land, Judge.

Petitory actions by Robert Marzette and Leanna Patterson against J. W. Cronk and others. Cases tried together with judgment for plaintiffs, and defendants appeal. Affirmed.

Joseph H. Levy, of Shreveport, for appellants. Foster, Looney & Wilkinson, of Shreveport, for appellees.

Statement of the Case.

MONROE, C. J. Plaintiffs, Robert Marzette and Leanna Patterson, brought three petitory actions, against different individuals, for the recovery of a certain tract of land in Caddo parish and certain lots in Shreveport, held by the defendants, respectively, and, as the same questions of fact and law are involved in all of them, they were consolidated and tried as one, with the result, that there was judgment for plaintiffs, from which defendants have appealed. The con-

solidated cases will be referred to in this opinion in the singular number.

An exception of vagueness having been sustained, with leave to amend, an amendatory petition was filed; and the cause of action thus alleged by plaintiffs is, in substance, as follows:

They set up title, as issue of a marriage between Celia Marzette and Dick Marzette and sole heirs of their mother, and allege that the land in question was acquired as community property by Wyatt Lundy, their mother's second husband, whom she survived, and whose interest they allege she inherited by reason of the fact that Lundy died intestate, leaving neither ascendants, descendants, nor collateral relatives. Defendants set up title as derived from F. H. Lundy, alleged to be a son of Wyatt Lundy by a previous marriage, and, as the claim asserted by plaintiffs, to the whole property was abandoned, in so far as the community interest of Wyatt Lundy is concerned they obtained judgment for only the undivided half interest which had belonged to Celia Lundy, as widow in community and are making no complaint of that judgment.

### Opinion.

The petitions allege that Dick and Celia Marzette were negro slaves, and, as such, were married near Oak Ridge, or Walnut Ridge, or Walnut Hill, "or some place of similar name," in the state of Arkansas, but that they are unable to say in which county, and defendants objected to the introduction of evidence in support of the allegation, on the ground that it was insufficient to put them on their defense. The objection was overruled, and it developed on the trial that the county intended to be referred to was Hempstead, and that defendants' counsel were furnished with that information almost as soon as it was obtained by plaintiffs' counsel, and in ample time to have enabled them to make such investigation as they thought proper. There was therefore no error in the ruling complained of.

[1] Defendants' counsel next objected to the introduction in evidence of two acts of the Arkansas Legislature, the one, of date December 20, 1866 (Laws 1866-67, p. 52) the other of date February 6, 1867 (Laws 1866–67, p. 98), as contained in the published volume of the acts passed during the session which began November 6, 1866, and ended March 23, 1867, which volume was offered as prima facie evidence of its contents, agreeably to R. S. 1440. It is argued here that, as the statute of the United States (Act May 26, 1790, c. 11, 1 Stat. 122 [Comp. St. 1916, § 1519]) declares that "the acts of the Legislature of any state * * * shall be authenticated by having the seals of such state * * * affixed thereto," it is incompetent for the Legislature of one state to authorize the admission in evidence of a statute of another, unless it is so authenticated, but there is nothing in the statute quoted which deprives the state of Louisiana of the power to declare that the statutes of another state shall be admissible in evidence, as published in book form, and that the book shall make prima facie proof of its contents. In fact, in some of the states, it is held that the courts will take judicial notice of the written laws of other states, in certain cases. 16 Cyc. p. 894, note 24 (though that position is, perhaps, not well sustained). It is further argued that:

"The Revised Statutes of Arkansas, printed in 1867, are not admissible in a trial in this state in 1914, unless a certificate accompanies the book to show that the laws therein contained are in force at the date of the trial."

The offer, as we find it in the record, is of two specified acts of the Legislature, "as contained in the acts of the General Assembly of the state of Arkansas, passed at the session * * * which began on Monday, the 5th day of November, 1866, and adjourned on the 23d day of March, 1867," etc. The

book is not in the record, but the acts are copied and the correctness of the copies is testified to by a member of the Arkansas bar, who was examined under commission, and cross-examined by defendants' counsel, and no objection is urged upon the ground that they are incorrect. If, however, it was the Revised Statutes that was produced, the situation is the same. The acts were not offered to show what the law was at the time of the trial, but what it became when they were enacted and how it affected those to whom they refer. In other words, plaintiffs assert that their parents, Dick and Celia Marzette, were then living in Arkansas, and that the acts in question gave them, and gave to plaintiffs themselves, a certain status, which, in coming shortly afterwards to Louisiana, they brought with them, and it is a matter of indifference to them what the law of Arkansas upon those subjects, or upon any subject, may be at this time. Defendants' objection was therefore properly overruled.

[2] The evidence in the case shows that, a few years prior to our Civil War, James B. Morrisett, a farmer, moved from Alabama to Hempstead county, Ark., and settled upon a farm adjoining that of Milton T. Holt, who at different times held the offices of probate judge and sheriff of the county, and that he then or thereafter owned two slaves, named Dick and Celia, respectively, who lived together as husband and wife, were so generally recognized, and had two children, Robert and Leanna, who were recognized, reared, and held out by them to be their children, and were so understood by all who knew them. They remained with Morrisett until the close of the war and for several years afterwards, during one of which years they worked on Judge Holt's place, and a year and a half or two years later moved to Shreveport, the family having, in the meanwhile, been increased by one member, an infant, who was named Ellen, and the name of their former master, which, apparently, they attempted to assume, having been changed to Marzette. In Shreveport they lived, as they had lived in Arkansas, as husband and wife, and held out the children whom they brought with them as their children, until Ellen died, and thereafter until Dick died, which last-mentioned event is said to have occurred about 35 years before the bringing of this suit. Thereafter Celia remained a widow until, it is said, November 1, 1880, when she married Wyatt Lundy, who at that time had a son, a boy named Fred. (or F. H. Lundy) and Wyatt Lundy acquired the land here in dispute, as property of the community resulting from that marriage. Marzette's son, Robert (plaintiff herein), had run away prior to the death of his father, and attempted to get back to his old home, but stopped at Washington (25 miles short of his destination), where he has since remained. Leanna (coplaintiff) had married, at a very early age, and had a daughter, called Febby, and, after the marriage of Celia to Lundy, Febby lived with her grandmother and was reared by her, while Leanna appears to have lived with her husbands (in succession) or "worked out," probably both. After a number of years, Wyatt Lundy died, and Celia became again a widow, and so remained until her death, about 11 years later, during which period she enjoyed undisturbed possession of the property in controversy. Some time after her death, in 1903, Fred. (or F. H.) Lundy, through counsel, presented a petition to the district court, alleging that he was the sole heir of his father, which was true, and that his mother's death had preceded that of his father, which was also true, and, without mentioning his stepmother, praying to be put in possession of the property left by his father, and there was judgment, decreeing, in general terms, that he be recognized as the sole heir of his father, and, "as such, the sole owner of all the property belonging to said Wyatt Lundy at

the time of his death," under which judgment he went into possession, not only of the property belonging to his father, but of the undivided half interest left by his stepmother in the property standing in his father's name, but which had belonged to the community and which half interest had devolved either upon his stepmother's heirs, or, in default of such heirs, upon the state. F. H. Lundy began to sell the property piece by piece, soon after he was put in possession, and, five days after he had sold the last piece, he disappeared from Shreveport without leaving his future address.

Defendants' counsel disputes, quite positively, the findings of fact as thus set forth, and which are, substantially, those upon which the judge a quo predicated his opinion, and has filed an exhaustive brief in support of the view entertained by him, in which he analyzes the testimony and criticizes its discrepancies at great length; and there is a good deal of room for criticism, for, with the exception of Judge Holt's son, who is still living on the place which his father bought in 1852 and upon which Dick and Celia Marzette were employed after the Civil War, all the witnesses in the case are negroes and a considerable proportion of these upon whom defendants rely are old negro women, a class of persons who are not infrequently more influenced, in giving testimony, by their sympathies and imaginations than by the facts with reference to which they testify. Mr. Holt's testimony is to the effect that he is 68 years old and lives, as he has done for the past 63 years, on his father's old place; that Dick Marzette belonged, at one time, to Joseph Duoy, who owned an adjoining farm, probably the farm that was afterwards owned by Morrisett; that he knew Dick at that time, and knew both Dick and Celia when they belonged to Morrisett, and afterwards when they worked on his father's place; that they then lived, and were generally regarded, as husband and wife, and as the parents of Robert and Leanna; that they worked on his father's place in 1866 or 1867, and remained in that county after that time, not more, as he thinks, than a year and a half or two years. He was asked, "You are positive that they lived there a year after they left your father's place?" and his reply was, "Yes, sir."

Nellie Speers, a negro woman who also came from Arkansas, testifies that she lived on the Holt place when Dick and Celia worked there, and that she was present, as a child of 6 years, when they were formally married by Judge Holt, in her mistress' room, but that they had previously lived as husband and wife, and had, then or afterwards, three children, Bob, Leanna, and Ellen, of whom Ellen was the youngest and died.

It is not improbable that Ellen was born after her parents left the Holt place, or, may have been so young while they were there as not to have attracted the attention of the Mr. Holt, who testifies.

Mr. Holt's testimony is criticized by the learned counsel for defendants, but we do not find that its value is thereby impaired. He does not profess to be endowed with anything phenomenal in the way of a memory, and was a little uncertain, or perhaps, mistaken, as to the ages of the two children, and the amount of kink in their father's hair, which, after a lapse of nearly 50 years, is not altogether surprising. Upon the main question, i. e., that Dick and Celia lived at Morrisett's and at his father's, as husband and wife, that they had two children, Bob and Leanna, and that they were generally recognized as married and as being the parents of the children, he is clear and positive, and there is every reason why he should be and none why he should not. He must have been, in 1866, 18 years old, and his opportunities for knowing the relations which subsisted in the Marzette family are indicated by the following, among the many,

questions and answers that appear in his cross-examination, to wit:

"Q. And you went around the house often enough to hear that (meaning that he went around the Marzette's cabin often enough to hear how they addressed each other)? A. Yes, sir; their house was close to the lot between my house and the horse lot, and I passed there going to the horse lot. Q. And you stopped there and heard that? A. No, sir; could hear it in passing, saw them three or four or a dozen times a day, heard it frequently, without stopping."

From which it is evident that counsel might almost as well have asked him how he knew about the relations which subsisted between the members of his own family.

Nellie Speers impaired her credibility somewhat, though our learned brother of the district court was very favorably impressed with her, by endeavoring, in answer to cross-interrogatories, as to who sent for her, who had paid, or who, she expected, would pay, her expenses, etc., to make it appear that she had, independently, but opportunely, come to Shreveport to pay a (probably, unexpected) visit to some friends, and with no particular reference to the case on trial. Nevertheless, though we are aware that there is such a maxim as, "Falsus in uno falsus in omnibus," we think her story, in regard to the Marzettes, is entitled to some credit. Mr. Holt's testimony is wholly uncontradicted, however, and, in the matter of the Marzettes living and holding themselves out as husband and wife and holding the plaintiffs out as their children is abundantly corroborated by other testimony showing that they arrived at Shreveport as husband and wife, with three children whom they called and treated as their own, and, so lived, in Shreveport, until Marzette died, though their son ran away and their daughter, Leanna, married at the age of about 14, and is not shown afterwards to have lived with them. It is shown, however, that Leanna's daughter, Febby, was taken and reared by Celia and was present when she died, and Leanna testifies that she too was present on that occasion, but produces no witness who corroborates her and is contradicted by those whom she mentions. Defendants' main reliance seems to be upon the testimony of several old negro women and one or two men, to the effect that they had heard Celia say, at different times, from 15 to 40 years prior to the giving of the testimony, that she had never given birth to any children, and those that she had had been given to her. This testimony has been carefully considered, and our conclusion in regard to it is that it is either deliberately untrue, or else was given under a misapprehension of something that Celia may have said. It must be remembered that her only son, Bob, had run away, and her only daughter, Leanna, had married, before their father died, and that, while Celia was a widow and after she married Lundy, neither of her children were with her and she had only her granddaughter, Febby, and Lundy's son, Fred, in her house. Under those circumstances, it is possible that, now and then, in comparing her condition with that of other women, who had their own children about them, she may have said that they were not her children, or, even that she had no children, and that the witnesses, being ignorant of those circumstances, and testifying to what they understood her to say, from 15 to 40 years, before, construed it quite otherwise than as it was intended, since we are satisfied that Celia gave birth to the two plaintiffs now before the court, and find no reason to believe that she would have deliberately and in merely casual conversations, with comparative strangers, have denied that she had done so. Defendants' counsel in the last resort questions the sufficiency of the evidence offered to show the death of Dick Marzette, and argues that, if he is not shown to be dead, Celia is not shown to have been the lawful wife of Wyatt Lundy, and hence had no interest in the estate left by him. The evidence satisfies us that Dick Marzette

died of some contagious or infectious disease, and was buried hurriedly, and with no particular formality, in the potter's field. The gravedigger and one or two others so testify, and though probably none of the witnesses saw him die, or identified him in the coffin, it was generally understood at the time that he was dead, and that it was his remains that were buried, and no one pretends that he has ever been seen since then, dead or alive. The evidence also shows that Leanna had been trying in the ineffective way that might be expected of a person in her condition, for nearly 10 years, to get some lawyer to take hold of this case, and that it has been her misfortune, not her fault, that she did not succeed at an earlier date. On the other hand, it could not very well have escaped the attention of an examiner of the titles offered by F. H. Lundy that the property that he was offering had been occupied by Celia for 11 years after the death of Wyatt Lundy, as the rightful owner or possessor, and we imagine that those who accepted the titles, without any inquiry concerning her heirs, did so with their eyes open, and for reasons that may have been satisfactory to them at the time, but which are not good reasons for denying to those heirs the inheritance to which they are entitled.

The Arkansas statute of December 20, 1866, declares that:

"The marriages of all persons of color who now live together as husband and wife are hereby declared to be legal and their children legitimate."

The statute of February 8, 1887, is to the same effect, and goes somewhat farther in the same direction. Under the law of Arkansas, therefore, Dick and Celia Marzette acquired the marital status, though we disregard the ceremony testified to by Nellie Speers; and, under the law of Louisiana, they acquired that status, without the aid of either the Arkansas law or the ceremony, by living here openly as husband and wife and so holding themselves out from the time they arrived in this state until the relation was terminated by the death of Marzette; and the children whom they brought with them and held out to be theirs are entitled to be so recognized. Blasini v. Succession of Blasini, 30 La. Ann. 1388; Bothick v. Bothick, 45 La. Ann. 1382, 14 South. 243; Sterrett v. Samuel, 108 La. 346, 32 South 428; Eames v. Woodson, 120 La. 1031, 46 South. 13; Mazzei v. Gruis et al., 128 La. 860, 55 South. 555.

The judgment appealed from is therefore affirmed.

SOMMERVILLE, J., took no part in this decision.