DAWKINS, J.
On August 24, 1920, Chaney Cooper (née Smith) and Selina Watson (née Smith) made ex parte application to the court below, alleging themselves to be lawful heirs — sister and niece, respectively — of Nancy Blackburn (née Smith), the latter having died intestate, without ascendants ox- descendants, and were sent into possession of her estate.
January 29, 1921, the husband filed in said succession a petition alleging that deceased had died without lawful ascendants, descendants, or collateral relations, and that he was entitled to inherit her estate. Assailing the correctness of the inventory previoxxsly made at the instance of those who had been sent into possession (hereinafter called defendants), he asked fox- and there was made a second appraisal, which fixed the value of the property at approximately $30,000. Petitioner (hereinafter called plaintiff) further alleged that, if related at all to the deceased, the defendants w'ere merely “natural collateral relations,” and that he was preferred by law as the heir of the deceased. In the alternative, he charged that, inasmuch as the deceased had died rich, in the sense of the Code, leaving petitioner in necessitous circumstances, he was entitled to one-fourth of her estate in full property as the marital portion.
There was judgment for defendants rejecting his demands in toto, and plaintiff has appealed.
Opinion.
There are two questions of mixed fact and law presented by this ca.se, to wit:
(1) Were 'the mother and father of deceased, lawfully man-ied so as to make the latter, the defendant sister and the faiher of the defendant niece, legitimate sisters and brother, entitling them to inherit from one another?
(2) If so, is plaintiff entitled to the marital fourth?
Legitimacy.
Not only does the burden rest upon plaintiff, as such, to make out his case, but by article 952 of the Civil Code:
“The incapacity of heirs is not presumed. He who alleges it must prove it.”
See, also 5 Cyc. pp. 626-628, and authorities in footnotes.
Preston Smith and Elvina Smith were slaves of Joseph Schlater before the Civil War, and must have maintained some kind of relation toward each other during the early ’40’s, for they had one or more sons who became soldiers in that great struggle. As early as 1857 or 1858 they were shown by the testimony of a granddaughter of the owner, who was living upon the plantation at that time, and attending school, to have *621 been, living together as husband and wife. The master died long before the war, and during the period of hostilities the witness recalled rather vividly going almost daily through the .quarters with her grandmother, and seeing this family, with dozens of others, living together. The standard of morality, according to the witness, Mrs. Boles, was very high, and each man was required to live with only one woman as his wife. The relation between Preston and Elvina Smith, mother and father of deceased, must havé been commenced, however, many years before Mrs. Boles could remember, and no one. else appeared to be living at the time of the trial of this case, more than 80'years afterwards, who knew the circumstances of its commencement, save a younger sister of Elvina, who swore that Preston and Elvina were married in a cabin in the quarters; but subsequent cross-examination tended to throw considerable doubt upon the dependability of this old woman’s testimony, in that it appeared she was but little older than her said sister’s oldest child. The relation, however, was maintained throughout slavery and after emancipation until the death of Preáton many years later. They were shown to have been negroes of more than ordinary stability and moral integrity for their race at that time. In the early ’70’s Preston became a head deacon in the Baptist church, and his wife, Elvina, became a “mother” of the same church. But, before assuming those duties, they were required by the chui’ch to be formally married, which was done by the obtention of a license and formal celebration. This fact, and the further fact that the said Mrs. Boles, who was a very favorable witness for defendants, testified that there were “never any ceremonies upon that plantation,” were seized upon by plaintiff’s counsel as the main circumstances to contradict the presumption of marriage created by their having lived together continuously through slavery and for long years thereafter. They lived and died respected by the white people who knew them, as well as by the members of their own race, and were always known, treated, and considered as husband and wife. When this ease was tried, four-fifths of a century afterwards, it is reasonable to assume that all who knew and might have testified as to the nature of the ceremony, if any, by which they commenced cohabitation, had, like the principals, passed to their eternal reward. But certain it is that the relation commenced with the consent of their owner and of themselves, as demonstrated by their conduct after the bonds of slavery had been stricken from them. This is all that the Code, at that time, in express terms, required of these human chattels. No matter how .formal or elaborate the ceremony, it was all without effect in so far as any legal rights might flow therefrom. But this court, like those of most of the other states, evolved the humane doctrine that by simple choice, evinced by continuing to live together after emancipation, they could attain for themselves and confer upon their children all of the benefits of a marriage lawful at its origin.
[1] There have been used, in some of the opinions of this court, in cases where the determinative facts, perhaps, rendered it unnecessary, apparently contradictory expressions, some saying a ceremony was necessary (Johnson’s Heirs v. Raphael, 117 La. 968, 42 South. 470), and others that it was unnecessary (Marzette v. Cronk et al., 141 La. 447, 75 South. 107, and Wiley v. Bowman, 144 La. 186, 80 South. 243). In one instance the bare joining together of the man and woman’s hands, and the announcing by their master that they were married, was held sufficient. Wiley v. Bowman, supra. In Johnson’s Heirs v. Raphael, it was said with much force that, if the mere living together of slaves, with the acquiescence of their mas *624 ter, could have constituted a marriage, each man and woman might have had a half a dozen wives and husbands. But this loses sight, to some extent, of the doctrine uniformly adhered to in all the adjudged cases that they should have continued to live together as husband and wife after emancipation. -Certainly no one of them could hav.e done this successively with more than one person without either having been guilty of bigamy or rendering the relation with one or all null. Again, how are we to set a standard as to just how much or what kind of .a ceremony was necessary? The matter might vary with the lax or stringent tendency or peculiar views of a particular court. We think the true solution and underlying basis for the recognition of a slave marriage is that there should have been a bona fide intention of the parties to assume, with the consent of their masters, the relation of husband and wife, and that this intention should have been carried out by the living together as such thereafter, in good faith, both before and subsequent to emancipation. Under this view, it is unnecessary to consider the weight of the circumstances heretofore adverted to and relied upon by plaintiff as tending to rebut the idea of a formal ceremony.
AVith respect to the child of Elvina, who went by the name of Sanders, instead of Smith, the name of hpr husband, the fact stands alone for whatever it may be woi*th. If the child were not really Smith’s, he alone had the right to repudiate it, for a limited time, after freedom, but never saw fit to do so. Granting that some other man was its father, this would be one circumstance tending to refute the idea that Elvina had in good faith entered into the marital relation with Preston, but it is not sufficient to overcome the overwhelming proof in the record to show a contrary purpose. Such a thing has, no doubt, happened with all races in all ages; it could not, of itself alone, render invalid an otherwise lawful marriage.
We shall not, at this time, again review the numerous decisions involving slave marriages, this having been done from time to time in previous cases. It is sufficient to say, that in our opinion, plaintiff has not only failed to disprove the marriage, which the law presumes under the circumstances of this case, but defendants have fully shown a status of marriage between their parents and grandparents to sustain their claims to the estate of the deceased.
[2] However, we are convinced that the situation also sustains the plaintiff’s claim to the marital fourth. His wife, with whom he had lived for some eight years, at her death left an estate worth approximately $30,000, which, for her race, made her “rich” within the meaning of article 2382 of the Code. Plaintiff at the date of the trial below was a man 68 years old, crippled, with White’s swelling in one of his legs, and with an incapacitated daughter about 40 years old dependent upon him for support. He earned a little money preaching for a small congregation of about 25 members in a church on property belonging to or given by his wife for that purpose. He at times also did a little work, and owned a small house and lot worth about $500, which he shared with other members of his family, and therefore paid no rent. However, we believe he comes within the intendment of the Code as a spouse left in necessitous circumstances. Sue. of Guillon, 150 La. 587, 91 South. 53.
Eor the reasons assigned, the judgment appealed from is amended by decreeing the plaintiff, Henry H. Blackburn, to be the owner, in full property, of an undivided one-fourth of the estate and effects of the deceased, Nancy Smith Blackburn, and as thus amended it is affirmed. Appellees are to pay the cost of this appeal, and all other costs shall be paid out of the mass of the succession..