No. 3909

**Second Circuit**

—

SMITH v. RAMBO ET AL.

—

(December 23, 1930. Opinion and Decree.)
(January 27, 1931. Rehearing Refused.)
(March 2, 1931. Writs of Certiorari and Review Refused by Supreme Court.)

—

John T. Campbell, of Minden, attorney for plaintiff, appellant.

Goff & Goff, of Arcadia, attorneys for defendants, appellees.

ODOM, J. This is a petitory action by which plaintiff seeks to be decreed the owner of an undivided two-thirds interest in the S½ of NE¼ of Section 10, Township 16 north, Range 10 west. He purchased the interest which he claims to own in this land from James Adams and Annie Campbell, wife of Henry Campbell, by notarial act, dated November 15, 1928, the deed reciting that the vendors inherited the property from their father and mother, William Adams and Winnie Adams. Plaintiff alleged and he contends that the said James Adams and Annie Campbell are two of the three sole, surviving, legitimate children and heirs of William Adams and his wife, Winnie Adams, who were married while slaves, according to slave custom, and who continued to live together and cohabit as man and wife for many years after their emancipation. He further alleges that defendants claim to own the said property and are asserting title thereto as children and sole, surviving, legal heirs of the said William Adams, but that they are the bastard offspring of said William Adams and a woman named Julia Carley, and that they have acquired no interest in the land by inheritance.

The defendants admitted in answer that they claimed to own the said property and affirmatively alleged that they were the sole, legitimate heirs of the said William Adams and had acquired the entire interest therein from him by inheritance; and further, that plaintiff's authors in title were illegitimate children and inherited nothing from their father. The trial judge rejected plaintiff's demands and he has appealed.

The land involved in this suit was acquired by homestead from the United States by William Adams, a colored man, born a slave and who died intestate on February 10, 1927. William Adams was the father of two sets of children, one set —James, Annie and Dusta—being the offspring of his union with a woman named Winnie, two of whom, James and Annie, being plaintiff's authors in title; and the other set, the defendants herein, being the offspring of his union with a woman named Julia Carley.

The defendants, or the children of Julia, were all born out of marriage. But William and Julia were married on February 21, 1913, many years after their children were born, and by the contract of marriage itself, they declared before a notary that the defendants (naming them), "are our own blood children, the issue of ourselves, and we hereby declare they are our legitimate children."

This act of legitimation was, it seems, in exact accord with the provisions of Article 198 of the Civil Code and therefore the children thus legitimated would have the same rights as if they were born during marriage (Civil Code, art. 199), if there had been no legal impediment to the marriage of their parents at the time they were conceived.

But article 204 of the Code provides:

"Such acknowledgment shall not be made in favor of children whose parents were incapable of contracting marriage at the time of conception."

It is alleged and contended by plaintiff that at the time the children of William and Julia were conceived, William had a living, lawful wife—Winnie, the mother of his authors in title, and that therefore, the children of William and Julia could not be legitimated and given the status of lawful heirs.

It is undisputed that the woman, Winnie, died long after the children of William and Julia were born, and it therefore follows that if Winnie and William were husband and wife, as is contended by plaintiff, and if their marriage had not been dissolved by a decree of court, these defendants are adulterous bastards and could not by an act of their parents be given the status of lawful heirs; and it further follows, of course, that if William and Winnie were husband and wife, according to slave custom, such unions being recognized and sanctioned under certain conditions by our courts, then their children are legitimate and inherited the whole of their successions.

But it is contended by defendants that William and Winnie were never man and wife, and the trial judge evidently did not think so, for he rejected plaintiff's demands. We cannot agree with him.

William and Winnie were born slaves and were owned by Henry Shehee, who brought them from Georgia to Louisiana long before the Civil War. The testimony establishes to our entire satisfaction that this man and woman while slaves began to live together as husband and wife and that they continued to so live together until they were emancipated and for many years thereafter. An aged colored man named John Moore, probably ninety years old at the time of the trial and referred to by some of the other witnesses as "Uncle John," testified that he was born a slave, was owned by the same Mr. Shehee and that he knew William and Winnie while they were slaves and after their emancipation up to their death. He says that, so far as he knows, they were never married by any formal, public ceremony, but that they were married while slaves according to what he understood to be the slave custom; that when the parties themselves consented to marry, William went to "Mos Henry" (referring to Mr. Henry Shehee, their master) and asked him for Winnie and that "Mos Henry" gave Winnie to him and that immediately William took Winnie, carried her to the home of his parents and began to live with her as his wife and that they continued to live together during their slavery up to the time they were emancipated. He was asked if William had Winnie as his wife during that time and he said that he did not know whether he called her his wife or not, but that after he asked "Mos Henry" for her, he took her and "I considered her his wife," and "she cooked, washed and done everything for him." He was asked how slaves married and he said:

"Some married by having a colored man to read the ceremony and read papers, and some did not."

This witness was married to one of Mr. Shehee's slaves and he was asked about the ceremony, and he said:

"They never had no ceremony, there is a way, know I ask Mr. Shehee for my wife, that was same as I was married by the white folks laws. Slave laws."

Mr. A. B. Shehee, eighty years old at the time of the trial, a son of Henry Shehee, who owned both William and Winnie, said he knew them both and that they lived together as slaves ordinarily did. With reference to slave marriages, he said:

"Don't think Winnie lived with William Adams' father and mother, but the way the marriages among negroes, they called it taking up together, they would usually get the consent of the owners to do so, and if it was on different plantations, it seemed that the two owners of the different parties would agree, that was in those times they had what they called 'patty rollers' and a negro felt safe to go to his wife's house Saturday night, that is about as far as marriages went during slavery."

He said that he did not know whether his father consented to the marriage of William and Winnie or not. He was then probably not more than five or ten years old, too young to take note of such incidents.

From the testimony of Mr. Shehee and the aged colored man, John Moore, it is clear that it was the custom—at least on the plantation where these slaves lived, for them to assume what they understood to be marital relations, or become husband and wife without any formal marriage ceremony, and from the testimony of John Moore, it is clear that William and Winnie did assume marital relations in accordance with that custom.

There is testimony in the record, admitted without objection, that both William and Winnie repeatedly told their children that they were married according to slave custom. Against this, however, is the testimony of Mr. Shehee that William told him during his latter years that he was never married to Winnie. While we do not doubt Mr. Shehee's testimony, yet we attach no importance to William's statement to that effect for the reason that it was made not long prior to William's marriage to Julia in 1913, and in response to Mr. Shehee's remark to him that he already had one wife. It was but natural that William should enter a denial in

view of the fact that it was rumored that he was soon to marry Julia.

It appears that about the year 1875 or 1880, William began to visit the woman Julia, and it is clear that he soon took her for his concubine. But, from the date of their emancipation down to 1875, and probably as late as 1880, William and Winnie lived together as husband and wife and William seems to have been faithful to her. Shortly after William entered the land in question as a homestead, he built a small house upon it which he and Winnie occupied together as a home. Later, he built another house on the land, into which Julia moved. For several years thereafter, he lived with both women— with one about as much as with the other; but, after Winnie became old, palsied and feeble, he abandoned her altogether and she went to live with her daughter. She died about 1906, and several years later, in 1913, William and Julia were married.

In support of their contention that William and Winnie were never married, counsel lay stress upon the testimony of Mr. Shehee that William told him that he was never married to her, and while, as stated, we do not doubt that William told him that, yet Mr. Shehee's testimony as a whole shows that he, like others who knew the couple, understood that they were man and wife. He said:

"Well, he told me more than once, I was kindly joking him about having two wives after I heard he married Julia Carley, and he said he never was married, and never had but one wife, I was accusing him of having two wives, he said he never had but one wife, I was joking him about marrying at his age."

Aside from this testimony of Mr. Shehee's, there is nothing in the record to indicate that William ever desired or intended during the life of Winnie to repu-

diate his marital relations with her. While it is true that he kept Julia as a concubine for many years, yet during all that time he constantly visited and cohabited with Winnie. We are strongly impressed that William did not intend to repudiate his marriage to Winnie. While it is true that after about the year 1880, he took Julia as a concubine and reared a large family of children by her and finally, it seems, became more attached to her than to Winnie, yet he did not marry Julia until after Winnie died. The fact that he did not marry Julia until after Winnie died is a circumstance which indicates that William knew he had no right to marry Julia as long as Winnie lived.

From the record as brought before us, we find:

(1) That William Adams and the woman, Winnie, were born slaves and lived as such until their emancipation;

(2) That during their slavery they consented to marry;

(3) That they obtained the consent of their master and owner to marry;

(4) That immediately after they obtained their master's consent to marry, they began. to live together as husband and wife in good faith, according to what they understood to be the slave custom of marriage;

(5) That they continued to live together in good faith as husband and wife until their emancipation; and

(6) That they continued their relationship as husband and wife by. living together for many years after their emancipation.

Having so found, we hold that William and Winnie acquired the status of married persons and that the children born of their union have the same right of inheritance as if they had been born of a marriage between free persons.

Counsel for defendants rely mainly upon the holding in the case of Johnson's Heirs v. Raphael, 117 La. 967, 42 So. 470, 471, that "while Article 182 of the Civil Code of 1825 is pregnant with the affirmation that slaves may marry with the consent of their masters, it surely contemplated some kind of a public celebration of the contract of marriage."

We cannot follow the holding in that case that a slave union understood by the parties to be a marriage, subsequently ratified, is invalid merely because it was not clothed with "some kind of a public celebration of the contract of marriage" in view of the fact that such holding has been repudiated in later cases.

In the case of Succession of Blackburn, 154 La. 618, 98 So. 43, 44, the court upheld a slave marriage, although there was no proof of a public or any other celebration. The court, after referring to the cases in which there were "apparently contradictory expressions, some saying a ceremony was necessary (Johnson's Heirs v. Raphael, 117 La. 968, 42 So. 470), and others that it was unnecessary (Marzette v. Cronk et al., 141 La. 437, 75 So. 107, and Wiley v. Bowman, 144 La. 186, 80 So. 243)," held as follows:

"We think the true solution and underlying basis for the recognition of a slave marriage is that there should have been a bona fide intention of the parties to assume, with the consent of their masters, the relation of husband and wife, and that this intention should have been carried out by the living together as such thereafter, in good faith, both before and subsequent to emancipation."

In the case of Marzette v. Cronk et al., supra, the marriage of slaves was upheld where they had lived together as man and wife in another state and continued such marital relations after removing to Louisiana. In that case, there was some testimony that there was a formal marriage ceremony, but it was disregarded, the court saying:

"And, under the law of Louisiana, they acquired that status (of marriage), without the aid of either the Arkansas law or the ceremony, by living here openly as husband and wife and so holding themselves out from the time they arrived in this state until the relation was terminated by the death of Marzette."

In a later case, that of Wiley v. Bowman, supra, the only ceremony was the joining of hands and the statement of their masters that they were married. It may be said that such was "some kind of a ceremony," but we doubt that the court attached any importance to it, for in speaking of the case of Marzette v. Cronk, supra, the court said:

"It was held that the parties there had, under the law of Louisiana, acquired the status of married persons, without the aid of any ceremony by living in this state openly as husband and wife and so holding themselves out from the time they arrived in the state until the relationship was terminated by the death of one of the parties."

Counsel for defendants in further support of their contention that a "ceremony" was necessary in slave marriages, cite the cases of Succession of Washington, 153 La. 1047, 97 So. 35, and Succession of Young, 166 La. 285, 117 So. 150. We do not find it necessary to discuss these cases further than to say that we do not think the court in either case intended to set aside the doctrine announced in the cases of Marzette v. Cronk, Wiley v. Bowman, Succession of Blackburn, supra, nor to give full sanction to the holding in the case of Johnson's Heirs v. Raphael, supra, that some kind of public ceremony was a sine qua non to a valid slave marriage.

The record discloses that after the death of William Adams, the court in an ex parte proceeding recognized these defendants as his sole heirs. That judgment was not binding upon the children of his marriage with Winnie as they were not made parties. Plaintiff in the case at bar, after setting out all the facts, prayed that the judgment be set aside. In that respect, he is entitled to relief.

For the reasons assigned, it is ordered and decreed that the judgment appealed from be reversed; and now ordered, adjudged and decreed that the ex parte order of the Second Judicial District Court of Bienville parish, In re Succession of William Adams and Julia Carley, No. 1758, probate docket, rendered June 29, 1927, insofar as it recognized Daisy Adams Rambo et al. as the sole, legal heirs of William Adams, deceased, be and the same is set aside and annulled; and further ordered and decreed that Annie Adams Campbell, wife of Henry Campbell, James Adams and Dusta Adams, children of William Adams by his wife, Winnie Adams, be recognized as the sole, legal heirs of William and Winnie Adams; and further, that the plaintiff, W. B. Smith, be and he is hereby recognized and decreed to be the owner of an undivided two-thirds interest in the S½ of NE¼ of Section 10, Township 16 north, Range 10 west, and entitled to possession thereof, and that the lawful heirs of Dusta Adams are the owners of the other one-third interest therein; all costs to be paid by the defendants.