## No. 8780.

### MRS. ANASTASIA POWERS, WIDOW, ETC. VS. EXECUTORS OF ROBERT Y. CHARBMURY.

In the absence of primary evidence to prove marriage, it may be proved by secondary or circumstantial evidence.

Reputation and long cohabitation will create a presumption of marriage; but such presumption can be rebutted by negative testimony.

Acts of the parties, showing their own conception of their mutual relations, are the best test of the legality of a marriage, of the celebration of which no proof has been, or can be adduced.

The reputation which gives rise to a presumption of marriage must be general and consistent, and must rest on proof showing that the relations between the parties began with a free consent to enter the state of matrimony.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot,* J.

*James Lingan* and *L. E. Simonds* for Plaintiff and Appellee.

*T. C. W. Ellis, Jos. P. Hornor* and *F. W. Baker* for Defendants and Appellants:

1. The general rule of law in all civil cases, is that the burden of proof is upon plaintiff, who must make his case not only probable but certain. Hennen Dig. Evidence, xiii (a), No. 1.
2. A suit involving the question of marriage *vel non,* is no exception to this rule. 15 An. 410; 20 An. 98; 15 An. 46.
3. Marriage in Louisiana is considered in no other light than as a civil contract, which must be established as conclusively as any other fact. C. C. Art. 90; 15 An. 410; 30 An. 1398.
4. Such marriages only are recognized by law as are contracted and solemnized according to the rules it prescribes. C. C. Art. 88.
5. Agreeing to live together as man and wife does not make a marriage; the law does not sanction voluntary cohabitation, nor elevate concubinage of whatever duration to the dignity of marriage. Bishop on Marriage and Divorce, §§218, 220, 224; 30 An. 1398.
6. A marriage should be proved by the best evidence, which is, first, the marriage certificate, or *proces verbal* of its celebration, or a certificate of its recordation. C. C. Art. 97 to 105.

Powers vs. Executors of Charmbury.

7. In the absence of the best or official evidence of the marriage, secondary and parol evidence may be admitted, such as: first, the testimony of the officer or minister who performed, or the witnesses who were present at the marriage; second, the testimony of the parties that they were married at such a time and place, by such an officer; and third, if the parties are not living, evidence of general reputation, declarations and conduct of the parties: but all to the same end, to prove the actual performance of marriage ceremony. 30 An. 1398.

8. In a case of marriage *vel non*, where no direct evidence of an actual marriage is produced, all the presumptions are against the marriage. 15 An. 410.

9. Reputation, conduct and declarations cannot constitute a marriage or take the place of the forms prescribed by law, but simply serve as a basis from which to draw the presumption that a marriage has been actually celebrated according to the forms of law.

10. Nothing less than strong evidence of a constant matrimonial cohabitation and a general, uniform, and uninterrupted reputation of marriage, is sufficient to base a presumption of the actual performance of the marriage ceremony upon. Bishop, §438; 18 Am. Law J. 642, Note; 73 Penn. (St.) 207; 9 Paige, 611; 1 House of Lords Sc. 182; 1 Appeal Cases, 686; 2 An. 945.

11. Proof of cohabitation alone, is insufficient to base a presumption of marriage upon. Ib.

12. Reputation is the opinion generally entertained in regard to the character or condition of a person by those who knew him or his family. Bouvier's Dictionary, *Verbo*, Reputation; Starkie on Evidence, p. 43.

13. The facts must be general, not particular, to form reputation. Ib.

14. Where there is conflict in the reports, it will not establish the marriage. Bishop, §438.

15. The conduct and appearance of the parties is to be looked to at home, among their relatives and friends, where they are known, not abroad or among strangers.

16. Evidence as to visits, and their treatment of each other, is to be weighed by the number, respectability and character of the witnesses; the degree of intimacy of the friends. 2 An. 945; 15 An. 410; 20 An. 97; 9 Paige, 611.

17. Verbal declarations and admissions of the parties, though deceased, are legal evidence, to show that the intercourse between the parties was illicit and dishonorable: that they were not married. 15 An. 46, 410; 20 An. 97; Bishop, §439: 9 Paige, 611; 3 Halst. 249; 9 Smedes & M. 9 and 56; 2 Dow. 482; 2 Nott & McC. 114; 31 Miss. 367, 547; Cowper (K. B.) 593; Greenleaf on Ev. §200.

18. A witness proved to have sworn falsely as to a fact about which he cannot be mistaken, is entitled to no credit. *Falsus in uno, falsus in omnibus.* 7 Wheat 339.

19. The declaration of the parties, to the effect that they have never been married will, under certain circumstances, outweigh the presumption of marriage arising from the fact of the parties having lived together as man and wife, and having been publicly recognized as such. 15 An. 46.

20. None but weighty, precise and consistent presumptions should be drawn. The known fact should draw with it the unknown fact, as an almost necessary consequence. If the facts or circumstances are so indefinite as to justify either of two presumptions, inconsistent and fatal to one another, no presumption should be drawn. Civil Code, 2288; 3 An. 103; 38 N. Y. 303; 20 An. 98.

21. Where the cohabitation is illicit in its origin, unless there is some evidence that the character of the relation has changed, it is a necessary presumption that the connection continues meretricious. When a particular status is proven, its continuance will be presumed. Bishop, §506; 63 Mo. 501, 514; 2 Dow. 483; L. R. 2, Sc. Ap. 494; 75 Penn. St. 207; 53 Penn St. 132: 2 Brewst. 202; 48 How. Pr. 1; 42 Md. 251; 38 Md. 93; 45 Mo. 144; 70 Ill. 484; 53 Miss. 37; 49 Miss. 751; 18 Am. L. J. 639, 641; 30 An. 1398.

22. One who claims as the wife cannot recover as the concubine.

The opinion of the Court was delivered by

Poché, J.   Plaintiff, alleging that she is the sole heir of her sister, Julia Powers, who was the wife of Robert Y. Charmbury, claims the rights of her sister in the community which existed between her and her alleged husband, Charmbury.

The defense is, that Charmbury was not married to Julia Powers, and that he was never married at all.

This appeal is taken by the defendants from a judgment recognizing the existence and validity of the alleged marriage between Charmbury and Julia Powers, and turns upon the issue of marriage *vel non.*

As plaintiff has been unable to prove the celebration of the marriage, she was compelled to have recourse to evidence, parol and documentary, for the purpose of showing long cohabitation as man and wife, the birth of children from their union, and general reputation of marriage among their neighbors, acquaintances and friends.   To meet this evidence, the defendants have introduced testimony intended to negative the existence of such a marriage.

The record is, therefore, very voluminous and the evidence naturally conflicting.   Hence, our examination of the case has been laborious and painful, and the more painful from the fact than an exhaustive consideration of the evidence has led us to conclusions different from those of our learned brother of the District Court.

Although our jurisprudence fully recognizes the doctrine and the rule that marriage will be presumed from reputation and long cohabitation, we cannot lose sight of the fact, that under our law marriage is a contract, and that the best proof of that contract is the evidence of some act, as prescribed in the Civil Code, showing at least the consent or agreement of the parties to enter into the contract of marriage.

Marriage is a contract highly favored by the laws of all civilized nations, because it is the pure fountain and source of the family, and the family is the foundation of society and of nations.    Hence, it is a subject which occupied the most serious attention of the framers of our Code, which contains very rigorous rules touching the manner of contracting or making marriages.   Among other provisions we find the solemn declaration that " such marriages only are recognized by law as are contracted and solemnized according to the rules which it prescribes."   C. C. 88.

In the interest of persons who were the issue of marriages of which no direct proof could be adduced, and in the interest of legitimacy, courts have somewhat relaxed the rigor of the precept and have sanctioned the rule which allows the proof of marriage by reputation, long

cohabitation and by other circumstantial evidence. But such evidence must show that the beginning of the relations between the parties must have been characterized by the free consent of the parties to contract the obligations and to assume the responsibilities of marriage; and the evidence must exclude the idea that the union began and that the parties were drawn together merely through the promptings of sensuality. Such conditions, even when followed by long cohabitation, although openly or publicly acknowledged, can result in nothing but concubinage, the parent of bastardy, the immoral impediment to marriage, and the fruitful source of shame and dishonor.

Guided by these principles which are enunciated in our Code, and have been consistently maintained in our jurisprudence, we are driven, from our examination of the evidence in this record, to conclude that plaintiff has failed to prove the existence of a legal marriage between Julia Powers and Robert Y. Charmbury.

The undisputed facts in the record are, substantially: that about the year 1850, Robert Y. Charmbury, a young Englishman, about twenty-seven years of age, already a prosperous merchant in this City, met Julia Powers, a native of Ireland, about eighteen years of age, then employed in the sales' department of a millinery establishment in this City. He soon became very attentive to her; to such an extent, that his attentions were observed by her employer, who was then her only friend and protector, and who did not look with favor on Charmbury's designs. But, notwithstanding her opposition, he became master of the situation; Julia left her employment and was not seen by her employer for several weeks, at the end of which time she appeared at the store and informed her former employer that she had been married to Mr. Charmbury. From that time on they cohabited together down to the year 1873, when Julia Powers died; and during which time three children were born of their union. Two of them died infants, the third lived to the age of thirteen or fourteen, and was recognized as his child by Charmbury, who brought him and the mother on a trip to Ireland and England in the year 1872, when the boy died and was buried in Liverpool.

Julia Powers died in this City in the house occupied by Charmbury and herself, and a notice of her death as " Julia, wife of Robert Young Charmbury," was inserted in one of the daily papers published in this City. Two years after her death, in compliance with her last and special request, her remains were disinterred by Charmbury, and sent to England for burial with the remains of her son, in Liverpool.

During their long cohabitation together, the couple were reputed among some of their acquaintances and friends as married; and among

others Charmbury had the reputation of being unmarried, and Julia Powers was reputed to be his housekeeper and mistress. And in this connection we note the statement of plaintiff's counsel, that Charmbury led " two lives," in one of which, with his business acquaintances and friends and club associates, he passed for a bachelor; and in the other, among his employees, near neighbors, and friends of Julia Powers, he occupied the attitude of a married man, recognizing and introducing Julia as his wife.

In our view of the case and of the law of that general reputation which creates the presumption of marriage, this very theory is destructive of plaintiff's claim, and it is on this point that begins our divergence from the conclusions of the District Judge. Bishop, Marriage and Divorce, §438.

The essential element in the circumstantial evidence is, that the general reputation and long cohabitation are the presumptive proofs of the free consent of the parties to live and to treat each other as man and wife. Now, under plaintiff's theory, it is conceded that among the friends of his youth, in his business circle, and among his associates of the superior class of society, Charmbury studiously concealed his relations with Julia Powers; and that in the opinion of the large mass of his friends and acquaintances, he lived and died a bachelor. It therefore follows, that his reputation as a married man and as the acknowledged husband of Julia Powers was not general and consistent, but was, on the contrary, partial and circumscribed within a circle of a very limited number of acquaintances; nay, it was not even general and uniform in his immediate neighborhood, for the evidence shows that very few families of that vicinity had social intercourse with Julia Powers; and that two families, at least, the respective heads of which were personal friends of Charmbury, were deterred from calling at his house by the well circulated rumor that the lady of the house was not his legal wife.

Leaving aside the conflicting statements involving the declarations of the parties on the subject of their union, we have based our conclusions mainly on facts and other circumstances growing out of the conduct of the parties, which show, beyond a doubt, to our minds, that the relations between them did not have their source in a free consent of the two parties to enter the state of matrimony, and that the circumstances of their union were well understood by themselves and by their nearest relatives and closest friends.

1. Plaintiff and Julia Powers, two sisters and orphans, never before separated, came together to this country in 1848, and were a short time after separated by force of circumstances, Anastasia remaining

in New York, and Julia coming to New Orleans, where she is represented to have married Charmbury, without writing a word to her only sister. She says not a word of her proposed marriage to her brother, Patrick Powers, who then lived in this City, nor to her employer, her avowed protector. When, a few weeks later, she informs the latter of her marriage, not a question is asked, where, by whom, and in the presence of whom the humble millinery clerk was married to the thrifty English merchant.

It is only in 1853 that plaintiff hears of the marriage, through a letter of Patrick, who was not on speaking terms with Julia until his death. Plaintiff came to New Orleans in 1857, and began to visit her sister in her new *role*, but never asked her, and to this day has never been informed, when, by whom, and where Julia was married to Charmbury. And in her testimony in this case she acknowledges that she has never made the slightest search for any paper or certificate of her sister's so-called marriage. Nor does it appear that any steps have been taken to procure the certificate of registry of the birth of the boy, or of his baptism. In her attempt to account for her failure to produce any written evidence of her sister's marriage plaintiff, in her zealous counsels' brief, exclaims: " With Charmbury himself and his sisters to destroy evidence for six years after poor Julia's death, they can very safely defy us to produce records." But to whose laches must we attribute this delay of six years? Why did plaintiff wait during six years before asserting her rights under her sister's marriage, and why did she institute these proceedings only after Charmbury's death? We attach a great deal of importance to this delay, which finds its only explanation in a well founded fear of meeting Charmbury alive, and face to face, on an issue which plaintiff should otherwise have had every motive to accelerate, rather than procrastinate.

, These acts, drawn from the conduct of Julia Powers and of her friends and relatives, conclusively support the conclusion that she herself deemed her position very equivocal, and absolutely negative the theory of a legal marriage between Charmbury and herself.

2. But on his side, the record is still more replete with acts and deeds pointing to the same conclusion.

At the time of the pretended marriage he had three sisters in England, living at his old home with his mother, for whom he is shown to have had the fondest attachment and the most ardent filial devotion; and he is held to us as having contracted marriage without sending a word to either the mother or the sisters. In 1851 he visited his native place, where he spent several months, dividing his time between his sisters and his mother, and he was unaccompanied by his

bride, whose name he did not even mention to either sisters or mother. The latter would, doubtless, have taken such deep interest in the recent marriage of her only son and protector. The same silence concerning his pretended marriage and his wife marked his next visit to England, in 1859, on the occasion of his mother's death. It would have been so natural to have filled the void in the family circle, grief stricken by a mother's death, by the introduction there of a fond and faithful wife and her then bright boy, the future hope of the Charmburys.

In 1872, the mother and her child accompany him to England; death claimed the boy, and he was buried in Liverpool, but a short distance from the village where lied the remains of the mother, in a vault built by and at the expense of Robt. Y. Charmbury.

How natural to have brought the remains of a legitimate child for burial near his grandmother! A day or two after the new bereavement, Charmbury goes to London to visit his sisters, with whom he spends a week. Misfortunes and grief, ordinarily, draw family ties more closely, and generally heal bitterness between relations. The occasion to introduce his wife to his sisters was most propitious, but he leaves her in Liverpool alone, in a strange city, with no company but her tears for her lost child. But we are told that he was on bad terms with his sisters, and that this reason forbade his wife's visit. Why did not that same feeling preclude his own visit? The additional fact that he took home from London to New Orleans, at his own expense, the son of one of his sisters on that occasion, is a circumstance which must be borne in mind as a test of his feelings towards his sisters.

In his last will, he expressed his desire to be buried by the side of his mother, and not a word was written for the gathering together of the ashes of the dead boy and his mother for final rest with him! The record also shows, that during the lifetime of Julia, Charmbury, in several acts of sale, and in sworn testimony given as security for a friend, described himself as unmarried; he did likewise in an official declaration of citizenship, during our civil war, made to the British Consul, to whom Julia Powers was also described as an unmarried British subject. And, finally, when Charmbury felt the cold approach of death, which reminded him of his last act on earth, in making his will he again declared that he was unmarried and had never been married.

We might enumerate many other acts of both parties, strongly indicative of their respective understanding of their mutual relations, which would add to the weight of our conclusions as to the non-existence of this alleged marriage, but it would be work of supererogation.

Being reluctantly compelled to differ with the District Judge on questions of fact, we deemed it our duty to report our conclusions by a considerable detail of the circumstances which impressed us in this cause.

The case of McConnell vs. City of New Orleans, 15 An. 410, is more than authority for our conclusions herein, for, in that case, the evidence in support of the presumption of the marriage was much more pointed and difficult to overcome than the state of facts on that point disclosed by this record. Benavis vs. Barba, 32 An. 1264; Blasini vs. Blasini, 30 An. 1388; Succession of Wm. Hubee, 20 An. 97; Philorick vs. Spangler, 15 An. 46; Holmes vs. Homes, 6 La. 470.

The judgment of the lower court is, therefore, reversed and set aside; and it is now ordered that plaintiff's demand be rejected and her action dismissed at her cost in both Courts.

Bermudez, C. J., recuses himself, having been of counsel.

Rehearing refused.