FOURNET, Justice.
 

 This proceeding was instituted by the sole surviving child of Louisa Tyson Gibson, deceased, and by the descendants of certain children of decedent who survived her but have since died, to have themselves recognized as the irregular heirs of the deceased and, as such, placed in possession of her estate to the exclusion of the descendants of the decedent’s other children against whom plaintiffs have pleaded the prescription of thirty years under the provisions of article 1030 of the Revised Civil Code.
 

 Plaintiffs alleged that Richard Gibson and Louisa Tyson Gibson were married on August 7, 1870; that subsequent thereto they acquired 211% acres of land which is situated in what is now known as the “Rodessa Oil Field”; that no children were bom to Louisa subsequent to her marriage to Richard Gibson, but prior thereto ten illegitimate children were born to her, who were duly acknowledged by her, and who survived her, with the exception of Chesley Gibson, Hannah Gibson Jackson, and Gus Gibson, who predeceased their mother; that Richard Gibson died intestate without leaving any legitimate ascendants, descendants, or collateral relations, and left as his sole and only heir at law his surviving widow, Louisa Tyson
 
 *523
 
 Gibson, who subsequently died without leaving any legitimate ascendants, descendants, or collateral relations, and without having invoked the necessary proceedings to be recognized as her husband’s heir and placed in possession of his estate; that no proceedings have been filed by any of the descendants of Louisa Tyson Gibson, or by any one else to be recognized as her heir and sent into possession of her estate.
 

 The plaintiffs pleaded the failure of twenty-five named descendants of the decedent’s last five children, whose surname is Gibson, to accept her succession within the prescriptive period of thirty years as a bar of their right to do so at this time, and reserved between themselves the right, one against the other, to file such a plea.
 

 Answers were filed to the rule to show cause by the curator ad hoc who was appointed to represent the absent heirs, and also by the State, which claims that the property escheated to the state by reason of the fact that the irregular heirs failed to have themselves formally recognized and placed in possession of decedent’s estate within the prescriptive time required by law.
 

 Some of the defendants excepted to the form of the proceedings and, as to them, plaintiffs were nonsuited. The plaintiffs, nevertheless, proceeded with the trial of the case contradictorily with the attorney for the State and the attorney for the absent heirs. Subsequently, however, by agreement, an order was entered by the court granting certain delays in order to enable all parties in interest to file interventions or make appearance in the case. In conformity to the order, interventions were filed by: (1) The widow and heirs of Gus Gibson; (2) the children and grandchildren of Hannah Gibson Jackson; (3) the children of Chesley Gibson; (4) R. W. Williams; (5) N. S. and W. R. Spearman; (6) the United Gas Public Service Company; (7) Richard Spear-man; (8) Henry Spearman, individually, as an heir of one of his children, and as tutor of the minor children of his wife (Narcisse Gibson Spearman).
 

 The interveners made allegations in conformity to their respective claims, and all, except the heirs of Hannah Gibson Jackson (who adopted the allegations of plaintiff’s petition), opppsed the prayer of plaintiffs’ petition and alleged in effect that the last five children born to Louisa, and whose surname is Gibson, inherit to the exclusion of the plaintiffs, for the reason that they were legitimated by their parents’ subsequent marriage, or, in the alternative, that they were born of a slave marriage, confirmed after the Civil War by. their living together as man and wife; that the last child was born, or probably the last two were born, subsequent to the marriage of 1870; and further, in the alternative, that the first children born to Louisa were bastards, incapable of being acknowledged by or of inheriting from their mother. They also alleged that they have been in possession of the property left by Richard and Louisa Gibson for more than thirty years.
 

 Answers were filed to the interventions of N. S. and W. R. Spearman and the
 
 *525
 
 United Gas Public Service Company by the plaintiffs, coupled with a reconventional demand, asserting the ownership of the property claimed by the Spearmans, .which they leased to the United Gas Public Service Company. It was agreed, on the day of the trial, and ordered by the court, that all matters set out in the interventions should be considered at issue whether answers had been filed or not.
 

 On these issues the case went to trial, and the trial judge held that neither Richard nor Louisa left any legitimate ascendants, descendants, or collateral heirs at their death; that all the children, including Loudella, the youngest child born to Louisa and Richard Gibson, were born before their marriage on August 7, 1870, and were not legitimated by the marriage contract; that there had been no slave marriage between Louisa and Richard Gibson; that the first five children born to Louisa were duly and properly acknowledged illegitimate children, as were the last five children; that the prescription of thirty years was well founded as to all who did not have the benefit of the suspension thereof by reason of minority; that accretion takes place in an irregular •succession, to the exclusion of the rights of the State; and that he would not adjudicate the question of the title to the •property in this case.
 

 From the judgment of the lower court, .all of the interveners and plaintiffs whose claims were rejected either in whole or in part have appealed, and those whose claims were recognized have answered the appeal -of the various appellants, asking that the judgment of the lower court be amended so as to recognize them as owners of the property which is described in the inventory.
 

 The record discloses that Noah Tyson purchased, in Alabama, the slave Louisa, who was about sixteen years old, and her infant son, Richard, and brought them first to Mississippi and subsequently to his plantation in the northern part of Louisiana. Prior to the Civil War, Louisa gave birth to four more children, Mollie, Jeff, Catherine, and Robert. According to the custom of the time, she assumed the surname of her master (Tyson) and gave the same name to her children, including the first born, Richard..
 

 Some time during the year 1860, Richard Gibson, a slave owned by Aaron Gibson, who lived in the southern’part of Arkansas, began to visit Louisa in her slave quarters on the Tyson place and continued to do so at comparatively regular intervals on week-ends, and by him she gave birth to five more children, viz., Chesley, Gus, Hannah, Narcisse, and Loudella.
 

 It appears that Richard continued to live on the Gibson plantation immediately following the Civil War until about' the fall of 1866, when he moved to the lower portion of the Tyson place and there built a cabin, taking Louisa Tyson and her children, including the first five, to live with them.
 

 On August 7, 1870, Louisa Tyson and Richard Gibson were formally married, in order that they might join the church, and Richard'became a preacher in the church.
 

 
 *527
 
 During the existence of the community, Louisa and Richard acquired 211% acres, situated in the parish of Caddo in what is now known as the “Rodessa Oil Field.” Richard 'died about the year 1897, and Louisa died on November 9, 1901. Prior to Louisa’s death, three of her children predeceased her, viz., Loudella Gibson, Narcisse Gibson, and Mollie Tyson.
 

 It also appears that N. S. and R. W. Spearman claim that at various and sundry times, by mesne conveyance from the five children born to Louisa and Richard Gibson and their descendants, they acquired the ownership of the property, which they leased to the United Gas Public Service Company.
 

 If any of the children of Louisa and Richard Gibson were born subsequent to August 7, 1870, or if they were legitimated by the contract of marriage itself, although born prior thereto, or were the issue of a slave marriage, ratified after their emancipation, such children would be legitimate and would inherit to the exclusion of the first five. We shall therefore discuss this phase of the case in the order mentioned.
 

 The interveners, in support of their contention that Loudella and probably Narcisse were born subsequent to the marriage of August 7, 1870, rely solely upon a certain memorial, which refers to Narcisse Gibson Spearman as having died in 1898 at the age of 28 years, and their impeachment of Robert Tyson’s testimony, who stated on direct examination that Loudella, the youngest of the children of Louisa and Richard Gibson, was born in 1869.
 

 Henry Spearman (witness for interveners), who was married to Narcisse Gibson, testified that 'the memorial above referred to was in his home; and that the information thereon inscribed was taken by a Mr. Austin from the family Bible.
 

 Austin admitted that he made the sale of the memorial in March, 1913. He also testified that he obtained the information with reference to Narcisse’s age at the time of her death and the year in which she died from a family Bible.
 

 If the foregoing comprised the entire testimony on the subject, we might conclude that Robert Tyson was in error when he testified of his own knowledge that Loudella was born in 1869, but Henry Spearman further testified that all of Louisa’s children were born prior to her marriage to Richard Gibson in 1870, and further stated that Robert Tyson married a short time after he did, and Robert’s marriage certificate, which is in the record,, shows that he was married on January 25, 1883, thus establishing the fact that Henry Spearman was married to Narcisse sometime in the fall of 1882. According to-his testimony, Narcisse was between 15- and 16 years of age when he married her,, thereby establishing the year of her birth as 1867 or earlier. This not only corroborates the testimony of Robert Tyson, but: strongly supports the improbability of interveners’ theory in this case based on the-memorial, because that would establish her age at the time of her marriage at twelve-years. Henry Spearman also testified that Loudella, Louisa’s youngest child, was one or ■ two years younger than Narcisse.
 

 
 *529
 
 Moreover, in addition to the foregoing, several witnesses for interveners gave testimony which strongly corroborates the testimony of Robert Tyson and Henry Spear-man that Loudella was born in 1869. For example, Bob Baukas stated that he and Hannah were the same age and that Loudella and his wife were the same age and that his wife was 67 years old, thus fixing the year of her birth in 1869. Lucinda Gibson, the widow of Gus Gibson, said that she was born on November 30, 1871, and that Loudella was two or three years older than she. Frances Sasser testified that she and Loudella were the same age, and that she was 68 years of age. Della Larry testified that she and Della were the same age, and that she was born on December 25, 1869.
 

 We therefore conclude that the trial judge was correct in finding that “the evidence preponderates strongly in favor of the view that all of Louisa Tyson Gibson’s children were born prior to her marriage with Richard Gibson on August 7, 1870.”
 

 Our conclusion that all of Louisa’s children were born prior to her marriage to Richard Gibson on August 7, 1870, brings up for consideration the question of whether or not the children born of that connection were legitimated by the act of marriage itself.
 

 We find no evidence in the record, and none has been pointed out to us, where any of the children were acknowledged by Louisa and Richard Gibson, either by an act passed before a notary and two witnesses prior to their marriage, or by the contract of. marriage itself, within the meaning and contemplation of article 198 of the Revised Civil Code; nor did they or either of them do so subsequent to the marriage by notarial 'act under the provisions of article 200 of the Civil Code, which articles are exclusive on the subject of legitimation of children born out of wedlock. Succession of Serres, 136 La. 531, 67 So. 356; Succession of Joseph Llula, 41 La.Ann. 87, 6 So. 555; Dupre v. Caruthers, 6 La.Ann. 156; Odelon Cormier et al. v. Hebrar Cormier, Administrator, et al., 185 La. 968, 171 So. 93, decided by this Court on November 4, 1936, citing therein Succession of Fortier, 51 La.Ann. 1562, 26 So. 554; Van Dickson v. Mayfield, 158 La. 529, 104 So. 315, and Succession of Jones, 185 La. 377, 169 So. 440, 442. See, also, Landry v. American Creosote Works, 119 La. 231, 43 So. 1016, 11 L.R.A. (N.S.) 387, and Talbot v. Hunt, 28 La. Ann. 3, 4.
 

 The next question we shall consider 'is: Was there a slave marriage between Louisa and Richard Gibson?
 

 “The true solution and underlying basis for the recognition of a slave marriage is that there should have been a bona fide intention of the parties to assume, with the consent of their masters, the relation of husband and wife, and that this intention should have been carried out by the living together as such thereafter, in good faith, both before and subsequent to emancipation.” Succession of Blackburn, 154 La. 618, 98 So. 43, 44. See, also, Succession of Young, 166 La. 285, 117 So. 150; Marshall v. Smedley, 166 La. 364, 117 So. 323; Ray v. Ray, 172 La. 559, 134 So. 744.
 

 
 *531
 
 In the case of Succession of Blackburn, supra, the point was made that a ceremony was necessary in order to establish the marriage and the court, after referring to previous cases on the subject, particularly the case of Johnson’s Heirs v. Raphael, 117 La. 967, 968, 42 So. 470, said that “there have been used, in some of the opinions of this court, in cases where the determinative facts, perhaps, rendered it unnecessary, apparently contradictory expressions, some saying a ceremony was necessary, * * * and others that it was unnecessary.”
 

 While the jurisprudence of this State <on slave marriages does not require proof •of a formal ceremony at the time of the marriage, nevertheless we think that a ceremony of any kind, even the joining of hands by the masters, would be the best evidence that the parties intended to assume the relationship of husband and wife and not merely for the purpose of having a loose relationship to satisfy their lust.
 

 It is the well-established jurisprudence of this State, in the absence of better evidence, that a marriage ‘may be •circumstantially established by the fact that a man and woman have, for a considerable time, openly lived together as man and wife and so conducted themselves toward each other as to enjoy a reputation among those with whom they came in contact as being husband and wife. Such cohabitation and .reputation of a man and wife are presumptive evidence •of the marriage. Succession of Joseph Llula, 41 La.Ann. 87, 6 So. 555; Succession of Anderson, 176 La. 66, 145 So. 270, and eases therein cited.
 

 This court, in the case of Powers v. Executors of Charbmury, 35 La.Ann. 630, said that “in the interest of persons who were the issue of marriages of which no direct proof could be adduced, and in the interest of legitimacy, courts have somewhat relaxed the rigor of the precept and have sanctioned the rule which allows the proof of marriage by reputation, long cohabitation and by other circumstantial evidence.” However, the court continued with the following qualification:
 

 “But such evidence must show that the beginning of the relations between the parties must have been characterized by the free consent of the parties to contract the obligations and to assume the responsibilities of marriage; and the evidence must exclude the idea that the union began and that the parties were drawn together merely through the promptings of sensuality. Such conditions even when followed by long cohabitation, although openly or publicly acknowledged, can result in nothing but concubinage, the parent of bastardy, the immoral impediment to marriage, and the fruitful source of shame and dishonor.”
 

 We have carefully considered and analyzed the evidence, comprised of several volumes, which reveals that some witnesses testified that they heard Louisa state that she had been married to Richard during slavery by her master; others testified that they heard Richard make this or a similar statement; and others testified that they heard the children of Louisa and Richard say that they heard either their mother (Louisa) or their father (Richard) say that they were mar-
 
 *533
 
 Tied during slavery by Louisa’s master by “jumping a broom.” None testified that Richard was present when they heard Louisa make the statement that she had been married by her master to Richard, or that Louisa was present when they heard Richard make the statement to the same effect. The testimony on that subject, we think, is very indefinite and vague and, in many instances, discredited ■or impeached either by their own testimony or by that of others.
 

 Furthermore, we find no evidence and none has been pointed out to us to establish the fact that the master of Richard Gibson ever consented to his marriage to Louisa Tyson, other than that of C. W. Long. He testified that he heard Richard Gibson and his master talk about getting a pass to go down into Louisiana to see his wife who, he thought, was a Tyson. He .also testified that there was a slave marriage between Louisa and Richard Gibson. Under cross-examination, however, he contradicted himself and testified that the marriage he was referring to on direct examination was consummated after the abolition of slavery. A review of this old gentleman’s entire evidence impresses us that he was at that time in the condition the trial judge described him as being, that is, “a senile white man from Arkansas.” Moreover, his testimony was impeached.
 

 Several of interveners’ witnesses and plaintiffs’ witnesses, including Robert Tyson, Louisa’s sole surviving child, many of whose relations were as close to Louisa and Richard as the relations of those who had heard that Louisa and Richard were married during slavery, testified that they never heard of any such marriage, thus showing at least that there was not a general reputation of their marriage, prior to their marriage of 1870.
 

 We think the trial judge correctly viewed the statements of “these witnesses to the effect that they heard Richard and Louisa say that they were married by ‘j'umping the broom,’ the slavery way, as the semi-facetious explanation of their early relationship rather than as evidencing a serious intention to assume the burdens and responsibilities of the relationship of man and wife.”
 

 We therefore conclude, as did the trial judge, that no slave marriage took place between Louisa and Richard Gibson.
 

 We now pass on to the next alternative plea of interveners, i. e., that the first five children of Louisa Gibson are adulterous bastards, the issue of an illicit union with her master, Noah Tyson, Sr., a white married man, and were therefore incapable of being acknowledged by or of inheriting from their mother. They cite article 202 of the Civil Code, defining “bastards,” and article 204, to show that they were incapable of being acknowledged, and article 920 to show that they are incapable of inheriting from their mother.
 

 When interveners began to offer evidence in support of their contention, plaintiffs objected to any proof of the paternity of the ancestors in any mode other than that specifically prescribed in article 209 of the Civil Code. Counsel for interveners, however, claim that article 209 must be read in connection with articles 207 and
 
 *535
 
 208, and contend that there is no provision in the Code which restricts the character of evidence that may be offered against illegitimate children in order to debar them from participating in the succession of their father or mother, and in support of their contention, cite the cases of Jung v. Doriocourt, 4 La. 175, decided in 1832, and Robinett v. Verdun’s Vendees, 14 La. 542, decided in 1840.
 

 In the Robinett Case, the. legal heirs of Alexander Verdun instituted suit against the defendants, who were free people of color, for the purpose of annulling certain acts of sale and recovering sundry tracts of land sold to defendants by the deceased, on the ground that said defendants are the illegitimate bastards of the deceased and therefore incapable of receiving from him by donations inter vivos or mortis causa. The court said that it had decided, “in substance, in the case of Jung et al. v. Doriocourt et al., 4 La. [175], 177, on a question very similar to the present one, that although children of color (from a white person) are not allowed to prove their natural paternal descent, when they have not been legally acknowledged, it does not follow that their natural paternal filiation cannot be proved against them.”
 

 The ruling in the Robinett Case, supra, was held inapplicable in the case of Jobert v. Pitot, 4 La.Ann. 305, where the estate of the mother was involved instead of that of the father on whose side it was claimed they were adulterous bastards. That case involved a suit by the father and sister of the deceased testatrix to set aside her will, on the ground that the universal legatee was the adulterous bastard child of the testatrix on the side of his father, who was a married man at the time of his conception and birth. It was shown that the testatrix acknowledged the child as her own and introduced in evidence the certificates of birth and of baptism of the instituted heir, representing him to be the son of the testatrix and
 
 of a father unknown.
 
 A letter written by the the testatrix was offered to prove the paternity of the child as alleged. The evidence was not allowed, and on appeal to this court, it was said:
 

 “This case materially differs from those of Jung v. Doriocourt, 4 La. 175, and Robinett v. Verdun’s Vendees, 14 La. 542. In both of these cases the legatees were children of color, and the plaintiffs claimed as heirs of the father, who was a white man. Had the claims been made by the legal heirs of the mother, as in this case, we presume the decisions would have been otherwise. We do not mean to say that the acknowledgment of the mother is an absolute title against her legitimate heirs. But as she was free, they can only oppose to it that it is false, or made in fraud of their rights. They cannot be permitted to attenuate its force, or to change its results, by going into a scandalous inquiry of matters en pais, not personal to the testatrix. * * *
 

 “This proposition appears to us equally true when the mother has acknowledged the illegitimate child, and the father is unknown.
 

 “We conclude, therefore, that the evidence offered was properly rejected by the court.”
 

 
 *537
 
 It was said in the Jung Case, supra, that
 
 “the object of the law [enabling legal heirs to prove paternity in a manner other than provided by the Civil Code\ being to protect heirs from the too great fondness of the natural parents of such children."
 
 (Italics ours.)
 

 We therefore conclude that the Jung and Robinett Cases are not applicable here, and that interveners could only avail themselves of the character of evidence prescribed by article 209 and article 210 of the 'Revised Civil Code to establish the paternity of plaintiffs in this case.
 

 Articles 207, 208, 209, and 210 of the Civil Code provide as follows:
 

 Article 207: “Every claim set up by natural children may be contested by those who have any interest therein.”
 

 Article 208: “Illegitimate children who have not been legally acknowledged, may be allowed to prove their paternal descent.”
 

 Article 209: “In the case where the proof of paternal descent is authorized by the preceding article, the proof may be made in either of the following ways:
 

 “1. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so;
 

 “2.
 
 When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such;
 

 “3. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived.”
 

 Article 210: “The oath of the mother, supported by proof of the cohabitation of the reputed father with her, out of his house, is not sufficient to establish natural . paternal descent, if the mother be' known as a woman of dissolute manners, or as having had an unlawful connection with one or more men (other than the man whom she declares to be the father of the child) either before or since the birth of the child.”
 

 Thus it may be seen that article 207 authorizes one who has an interest to contest the claim set up by a natural child; article 208 authorizes an illegitimate child, who has not been legally acknowledged, to prove his paternal descent in order to claim the alimony authorized by article 240 of the Civil Code; and article 209 merely prescribes the method of establishing paternity “in the case where the proof of paternal descent is authorized by the preceding article” (208).
 

 The evidence is barren of any private writings in which Noah Tyson, Sr., acknowledged any of Louisa’s first five children, or called them his children, or that he ever, in public or in private, acknowledged them as his children or called them his children in conversation or that he helped to educate them as his own children. Interveners therefore failed to establish proof of paternity under article 209 of the Civil Code and likewise under article 210 of the Civil Code, because the record does not show that Louisa Tyson ever made oath that Noah Tyson
 
 *539
 
 was the father of any of her children. Moreover, she was not free of dissolute manners within the meaning and contemplation of the article.
 

 The trial judge excluded all evidence to establish by reputation that Noah Tyson, Sr., was the father of the first five children, but allowed, over plaintiffs’ objection, “first, parol evidence of statements made by Louisa Gibson that the father of these children was Noah Tyson, Sr., and, second, statements and declarations made by the children themselves as declarations against interest made at unsuspicious times,” and we think properly commented thereon as follows:
 

 “To engage in what the court referred to as ‘scandalous inquiry’ to brand a group of persons and their issue as adulterous bastards, to fasten paternity of mixed-breed whites and negroes upon a white married man, though now dead, reflecting upon his legitimate posterity, and to deprive a group of persons of the right to inherit from their own mother and ancestor, when the alleged white father’s succession is not in question, merely by fixing upon them a disreputable status, would seem to require some higher proof, some proof other than and greater than suspicion, general reputation and idle comment, even though that be based upon what human experience might indicate to one of normal intelligence, as being a probability.”
 

 We therefore conclude that the paternity of Louisa’s first five children has not been established, and it makes no difference whether the father is unknown or not if they were duly acknowledged by the mother. Jobert v. Pitot, supra; Taylor v. Allen, 151 La. 82, 91 So. 635.
 

 When Richard Gibson died on March 22, 1897, according to the facts disclosed by the record, he left no legal' relations, but he was survived by his widow Louisa Gibson, who thereby became his irregular heir (articles 917 and 919 of the Revised Civil Code), and consequently acquired the right to be recognized as such and be placed in possession of her husband’s portion of the community property. Hawkins v. Williams, 146 La. 529, 83 So. 796, 798. Louisa died on November 9, 1901, without having made a demand to be put in possession of her husband’s estate, and therefore, under the provisions of article 949 of the Revised Civil Code, at her death transmitted that right to her heirs.
 

 We think the record shows that all of Louisa Gibson’s children were duly acknowledged by her in accordance with the jurisprudence of this state. She not only openly and publicly acknowledged that they were her children, but reared and treated them as such until the date of her death, and they were therefore raised to the status of natural children, capable of inheriting from her. Minor v. Young, 148 La. 610, 87 So. 472; Taylor v. Allen, supra.
 

 But it is the settled jurisprudence of this State that the “fiction of the law, called ‘representation’ does not apply to irregular successions.” Hawkins v. Williams, supra. Succession of Fernandez,. 163 La. 362, 111 So. 787. It therefore
 
 *541
 
 follows that Louisa having died intestate and having left no legal relations, her surviving children, namely, Dick Tyson, Jeff Tyson, Robert Tyson, Chesley Gibson, Gus Gibson, Hannah Gibson, Catherine Tyson Payne, became her irregular heirs and inherited a right of action to be judicially recognized as such and placed in possession of their mother’s estate, which included the right to claim Richard Gibson’s interest in the community property.
 

 ' [14] Although Richard Gibson died on March 22, 1897, and Louisa died on November 9, 1901, no action had been taken by any of the heirs to be placed in possession of their ancestors’ estate until this suit was filed. They had thirty years within which to accept or renounce the succession under article 1030 of the Revised Civil Code and to institute action for the estate under article 3548 of the Revised Civil Code.
 

 But it is contended on behalf of interveners that the plea of prescription of thirty years to accept or renounce the succession under article 1030 is suspended and interrupted on the ground that they were in possession of the property which constituted unequivocal notice of the fact that they accepted and intended to claim the benefit of their inheritance,
 

 “The doctrine, le mort saisit le vif, has no application to irregular successions. An irregular heir * * * inherits only a right of action to be judicially recognized as an heir and to obtain possession of the estate.” Hawkins v. Williams, supra. It was held in the case of Generes v. Bowie Lumber Co., 143 La. 811, 79 So. 413, 416, that prescription of thirty years, under the provisions of article 1030 of the Revised Civil Code, irrevocably established the status of the heir or relation to the deceased person as either that of an heir or that of a stranger, that is, if a legal heir, his right or faculty of renouncing is then prescribed; if an irregular heir, his right or faculty of accepting or of being put in possession of the estate is prescribed and is presumed irrevocably to have renounced it.
 

 The court’s language on -the subject-matter is as follows:
 

 “Our own interpretation of article 1030 of the Code is that what prescribes at the end of 30 years is, not both the right of an heir to accept and at the same time his right to renounce a'succession, for that is impossible, but the right to accept or the right to renounce, as the case may be, depending upon whether the heir be one who was required to accept or one who was required to renounce within the 30 years. * * *
 

 “If it be the faculty of accepting that the heir has to exercise, in order to avail himself of his rights as an heir, it must be exercised within 30 years, or the faculty will become prescribed. * * *
 

 “At the expiration of the 30 years the status of the person or relation is irrevocably fixed by the prescription es-. tablished by article 1030 of the Code, either as an heir or not an heir, depending upon what his status was before the 30 years ended. * * *
 

 “If he was a forced heir * * * if he has not renounced the succession, [he is
 
 *543
 
 presumed] irrevocably to have accepted it at the end of 30 years; for his right or faculty of renouncing is then prescribed. On the other hand, if he was an irregular heir, he is presumed, if he has not formally accepted, or been put into possession of the estate, irrevocably to have renounced it at the end of 30 years; for his right or faculty of accepting is then prescribed.” (Brackets ours.)
 

 See, also, Harang et al. v. Golden Ranch Land & Drainage Co., 143 La. 982, 79 So. 768; Glenn v. West, 151 La. 522, 92 So. 43.
 

 This prescription, however, is suspended during the minority of any of the heirs. Articles 3554 and 3522 of the Revised Civil Code read as follows:
 

 Article 3554: “Prescription does not run against minors and persons under interdiction, except in the cases specified by law.”
 

 Article 3522: “Minors and persons under interdiction can not be prescribed against, except in the cases provided by law.”
 

 See, also, Tyler v. Lewis, 143 La. 229, 78 So. 477.
 

 The record shows that all of Louisa’s children have since died except Robert Tyson, who was born in 1858 and was therefore a major more than thirty years after the death of both Louisa and Richard. The plea of prescription of thirty years as to him is therefore good. Chesley Gibson died in the year 1933, and the record shows that he was born in 1861 and therefore' the plea is also good as to him. Jeff Tyson lived until 1922, less than thirty years after the death of both Richard and Louisa, but in so far as the record discloses no interruption of prescription was shown as to any of his heirs, and therefore as to them the plea of prescription is well founded.
 

 We find, as did the trial judge, that prescription on account of minority of some of the heirs of Richard Tyson, Catherine Tyson Payne, Hannah Gibson Jackson, and of Gus Gibson was suspended, as is shown by a prepared table referred to by the district judge in his opinion.
 

 The State has asserted a right to the interest of the irregular heirs against whom prescription had run, on the ground that “accretion only takes place in legal or intestate successions” under the provisions of article 1022 of the Revised Civil Code, which reads as follows:
 

 “The portion of the heir renouncing the succession, goes to his coheirs of the same degree; if he has no coheirs of the same degree, it goes to those in the next degree.
 

 “This right of accretion only takes place in legal or intestate successions. In testamentary successions, it is only exercised in relation to legacies, and in certain cases.”
 

 Those against whom prescription has run in this case, under the decision of Generes v. Bowie Lumber Co., supra, became strangers to the succession, and their portion therefor, in so far as this case is concerned, is the same as if they had never existed. Under the provisions of article 1024 of the Revised Civil Code, the remaining heirs, whose right to accept
 
 *545
 
 the succession has not run, must, in doing so, accept
 
 the succession as a whole and can not accept only a part.
 
 Moreover, under the provisions of article 929 of the Revised Civil Code, it is only “in defect [default] of lawful relations, or of a surviving husband or wife, . or
 
 acknowledged natural children,
 
 the succession belongs to the State.” (Brackets and italics ours.) And under article 485 it is provided that “the succession of persons who die without heirs, or which are not claimed by those having a right to them, belong to the State.”
 

 It is therefore our opinion that under the clear provisions of the articles of the Code, it was never intended that a succession should escheat to the state except in default of any heirs.
 

 The final question for our determination is whether or not the trial judge properly refused to adjudicate the 'title to the property in this case.
 

 A review of the pleadings discloses that plaintiffs’ object in instituting the original proceedings, as disclosed by the prayer of their petition, is that they “be recognized as the heirs .of * * * Richard and Louisa Gibson and sent into possession of their estates.” The interveners specially reserved the right.“to assert and maintain in a proper and appropriate action, and proceeding, their claim and title * * * to the property * * * and that the decree to be rendered herein * * * be without prejudice to the rights of * * * intervenors to hereafter assert and maintain the title so held by them.”
 

 In order to' show their interest giving them a right to intervene in these proceedings, interveners necessarily had to assert their claims, such as they were, to the title to property. This the plaintiffs claim put at issue their title.
 

 Interveners took the suit as they found it. Furthermore, plaintiffs, until they are formally recognized as irregular heirs of Louisa Gibson and placed in possession of her estate by judgment of the court, have no standing in a petitory action. Glenn v. West, supra.
 

 The trial judge decided, and we agree with him, that “the ends of justice demand that the determination of title to specific property be left to the parties in the light of this decision, or to further litigation where all other interwoven claims may be properly adjudicated.”
 

 For the reasons assigned, the judgment of the lower court is affirmed.