REBA NORA FRANZEN, PLAINTIFF-APPELLANT, v. THE
EQUITABLE LIFE ASSURANCE SOCIETY OF THE
UNITED STATES, DEFENDANT-RESPONDENT.

Argued January 20, 1943—Decided August 10, 1943.

458

Before Justices BODINE, HEHER and PERSKIE.

For the appellant, *Abraham J. Slurzberg.*

For the respondent, *Collins & Corbin* (*Edward A. Markley* and *James B. Emory,* of counsel).

The opinion of the court was delivered by

HEHER, J. The question for decision is whether plaintiff was the wife of George Albert Franzen at the time of his death on August 6th, 1939. If so, she is entitled to the proceeds of a group insurance policy issued by defendant to the deceased's employer, E. I. duPont de Nemours & Co., Inc. The employment commenced prior to the time of the asserted marriage; and Franzen designated his father as the beneficiary of the policy. The designee died on January 22d, 1939, but the insured failed to appoint a substitute beneficiary. The policy provided that, in the event of nonappointment of a beneficiary, the insured's widow, or his mother if he died unmarried, would be entitled to the stipulated benefits.

The issue was resolved in the negative by the District Court Judge, sitting without a jury. There was no ceremonial marriage; and the ruling was that the evidence did not establish plaintiff's contention of a common law marriage in New Jersey on April 17th, 1937, two days before the insured's departure for the State of Louisiana to labor there in the service of his employer, but rather that it suggested merely "an agreement to be married as soon as possible," and that, though they lived together in Louisiana, and "from that point on, and until his death on August 6th, 1939," the insured's "references to the plaintiff, with his fellow workmen, and their families, incontrovertibly by the testimony, and admittedly by the defendant, were as his wife," and "there

is no doubt that the course of conduct between the plaintiff and decedent followed in Louisiana was that of husband and wife," there was no contract of marriage in compliance with the requirements of the Louisiana Code.

Error is assigned upon the admission into evidence, on respondent's motion and over appellant's objection, of an *ex parte* affidavit made by a member of the bar of the State of Louisiana purporting to reproduce verbatim certain provisions of the revised Civil Code of that state, adopted in 1870, pertaining to the constitution of the contract of marriage, and passages from opinions rendered in two Louisiana cases not "reported in the Southern reports," *i. e., "Succession of Lorenzo Alexander and Julia Sharkelford, or Washington, his wife (Court of App.), 4 Court of Appeal, Parish of Orleans,* 272 (at *p.* 275), and *Powers* v. *Executors of Charmbury (Supreme Court),* 35 *La. Ann.* 630 (at *p.* 632)."

The specifications are that the affidavit was insufficient in content, in that it did not reveal "whether the law stated therein was in effect at the time the appellant and decedent cohabited in the State of Louisiana, and if so, how it was applicable to the facts before the court;" that "this manner of proof denied the appellant her fundamental right to cross-examine the affiant as to his special qualifications as an expert witness and as to the application of the authorities to the facts in the case at issue," and that, at all events, it was incumbent upon defendant to introduce also expert opinion as to the law of Louisiana relating to the contract of marriage "as shown by exposition, interpretation and adjudication."

The general rule at common law is that a foreign law is essentially a matter of "fact" determinable by the jury. Unlike the *lex fori,* it is not the subject of judicial notice. Until recently, this principle has prevailed in this state. *Title Guarantee and Trust Co.* v. *Trenton Potteries Co.,* 56 *N. J. Eq.* 441; *Fithian* v. *Pennsylvania Railroad Co.,* 91 *N. J. L.* 275; *Coral Gables, Inc.,* v. *Kretschmer,* 116 *Id.* 580. But the wisdom of committing this function to untutored lay minds has long been questioned; and sentiment eventually crystallized among legal scholars in favor of the

view that there is no essential difference in function between the ascertainment of foreign law and the law of the forum, and therefore foreign law should be proved to the judge. In 1936, the National Conference of Commissioners on Uniform Laws formulated what is now labeled the "Uniform Judicial Notice of Foreign Law Act." The essence of this draft was incorporated into our statute law by chapter 81 of the Laws of 1941, as amended by chapter 104 of the Laws of 1942. Thereby, our courts are directed to take judicial cognizance of "the common or statute law" of any state, territory or other jurisdiction of the United States, if such is pleaded. It is provided that the "determination of such laws shall be made by the court and not by the jury, and shall be reviewable;" that the court "may inform itself of such laws in such manner as it may deem proper," and "may call upon counsel to aid it in obtaining such information;" and that, if the "common or statute law" of another state, territory or jurisdiction of this country be pleaded in an action in a court of this state, "any party to such action may introduce any admissible evidence of such law." *Pamph. L.* 1941, *p.* 193; *Pamph. L.* 1942, *p.* 365; *N. J. S. A.* 2:98–28, *et seq.*

Apart from the principle of uniformity, the design of this enactment was to achieve that certainty in the ascertainment and application of foreign law which is attainable only when the determination is made by one versed in the philosophy and principles of law and in exegesis after the searching and exhaustive inquiry afforded by judicial notice of the pertinent statutes and decisions of the foreign state sovereignty. This statute was preceded by acts providing that "statute books and printed laws" issued by authority of another state of the United States or a foreign country "shall be received as evidence of the public laws thereof;" and that "the reports of judicial decisions" of such states and foreign countries "may be judicially noticed by the courts of this state as evidence of the common law of such states or countries, and the judicial construction of the statutes or laws thereof and the usual printed books of such reports shall be plenary evidence of such decisions." *Comp. Stat., p.* 2228, §§ 24, 25 and 26; *R. S.* 2:98–17, 2:98–18.

By force of the act of 1941, *supra,* the question of the terms of the foreign law would seem to be one of law rather than fact. It is provided that the judge's determination shall be reviewable; and it is elementary at common law that the resolution of an issue of fact is not revisable on error if the finding have a tangible basis in the evidence. Yet there is authority for the view that foreign law is in essence a question of fact, even though determinable by the judge and reviewable on error. *Beale's Conflict of Laws,* § 621.1. In the sense that foreign law is provable by evidence, according to the usual rules of evidence except as modified by the judicial notice statutes and the nature of the inquiry, it is a matter of fact, but the ultimate inquiry is one of law, *i. e.,* the determination of what the law is, just as is the case with the *lex fori.* The judge is not confined therein to the evidence of foreign law adduced by the parties.

The courts are enjoined so to interpret the act of 1941, *supra,* "as to effectuate its general purpose to make uniform the law of those states which enact it." *N. J. S. A.* 2:98–33. But this is not in itself a complete norm of construction. It is a remedial statute; and on well-settled principles the language is to be given a liberal interpretation to suppress the mischief and advance the remedy.

Thus, the introduction of the affidavit did not violate appellant's substantial rights. It did not embody the affiant's opinion of the law of Louisiana respecting the question at issue; it merely presented a transcript of the pertinent provisions of the Louisiana Civil Code, and made reference to two interpretative decisions, all of which were available to the court by the application of the statutory principle of judicial notice.

But it is maintained that, since the trial judge found that "the course of conduct between plaintiff and decedent followed in Louisiana was that of husband and wife," marriage in conformity with the laws of that state was established. This point is not well made.

These are the pertinent provisions of the Civil Code of Louisiana, as revised in 1870: "The law considers marriage in no other view than as a civil contract." *Article* 86. "The

laws prescribe: 1. The manner of contracting and celebrating marriages; 2. The legal effects and consequences of marriage; 3. The manner in which marriages may be dissolved." *Article* 87. "Such marriages only are recognized by law as are contracted and solemnized according to the rules which it prescribes." *Article* 88. "As the law considers marriage in no other view than that of a civil contract, it sanctions all those marriages where the parties, at the time of making them, were: 1. Willing to contract; 2. Able to contract; 3. Did contract pursuant to the forms and solemnities prescribed by law." *Article* 90. *Chapter* 3, *article* 99, *et seq.,* provides for the issuance of licenses and designates those authorized to celebrate marriages. "No minister of the gospel, or other person, shall celebrate any marriage in this State, unless he shall have obtained previously a special license to him directed, issued by the person appointed by law to grant licenses in the parish wherein the marriage is to be celebrated, authorizing him to celebrate such marriage." *Article* 104. "The marriage must be celebrated in presence of three witnesses of full age, and an act must be made of the celebration, signed by the person who celebrates the marriage, by the parties and the witnesses. This act must be made in duplicate and appended to the license, issued in duplicate; one of these acts, appended to the license must be returned within thirty days from the date of celebration by the person celebrating the marriage to the person who granted the license, who shall file and record the same in his office." *Article* 105. "The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith." *Article* 117. "If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage." *Article* 118.

There was a lack of uniformity in the early decisions of the courts of Louisiana respecting the meaning of these provisions. Some of the cases declared these codal regulations to be merely directory, while others held that strict compliance therewith was requisite to the constitution of a lawful mar-

riage. *Vide Duty* v. *Fowler Commission Co.*, 146 *So. Rep.* 336. The former view now seems to prevail. Marriage is there regarded as "a civil contract, highly favored, and depending essentially on the free consent of the parties capable by law of contracting. Our Code does not declare null a marriage not preceded by a license, and not evidenced by an act signed by a certain number of witnesses and the parties; nor does it make such an act exclusive evidence of a marriage. These laws relating to forms and ceremonies, here regarded as directory to those alone who are authorized to celebrate marriages, are intended to guard against hasty and inconsiderate marriages in defiance of parental authority. Like all other contracts, it may be proved by any species of evidence not prohibited by law, which does not presuppose a higher species of evidence within the power of the party." *Succession of St. Ange*, 161 *La.* 1085; 109 *So. Rep.* 909; *Oliphant* v. *Louisiana Long Leaf Lumber Co.*, 163 *La.* 601; 112 *So. Rep.* 500; *Douglas* v. *Shepard*, 193 *So. Rep.* 264. This principal was enunciated in the early case of *Holmes* v. *Holmes*, 6 *La.* 463, where it was held that "cohabitation as man and wife furnishes presumptive evidence of a preceding marriage." But this is a presumption of an actual marriage that is rebuttable. The rigor of the codal precept was relaxed by the courts in the interest of "persons who were the issue of marriages of which no direct proof could be adduced, and in the interest of legitimacy." *Powers* v. *Executors of Charmbury*, 35 *La. Ann.* 630. "Where a man introduces a woman to his friends as his wife, calls her his wife, and he and she live together publicly as man and wife until her death, and their children, born while they are thus living together, are baptized, reared, and educated as their legal offspring, the law will presume that they had been lawfully married, and that their children are legitimate, until it is shown that no marriage between them ever took place, or that it was void on account of some nullity established by law." *Blasini* v. *Succession of Blasini*, 30 *La. Ann.* 1388. See, also, *Succession of Benton*, 106 *La.* 494, 503; 31 *So. Rep.* 123; *Boykin* v. *Jenkins*, 174 *La.* 335; 140 *So. Rep.* 495; *Succession of Tyson*, 186 *La.* 516; 172 *So. Rep.* 772.

Where reputation gives rise to the presumption of marriage, and documentary evidence of the marriage is not producible, secondary proof by oral testimony is admissible. And this evidence, to warrant an affirmative finding, must be "consistent and cogent." *Johnson* v. *Hogan & Winchester Transfer Co.*, 171 *So. Rep.* 467. Yet secondary proof of a ceremonial marriage is not a *sine qua non*. The presumption alone may suffice, if not rebutted. *Succession of Anderson*, 176 *La.* 66; 145 *So. Rep.* 270; *Succession of St. Ange, supra; Holmes* v. *Holmes, supra; Oliphant* v. *Louisiana Long Leaf Lumber Co., supra; Blasini* v. *Succession of Blasini, supra; Cunningham* v. *Jordan Drilling Co.*, 19 *La. App.* 40; 138 *So. Rep.* 689.

A common-law marriage cannot arise under the laws of Louisiana. The Supreme Court has lately declared that "A so-called common law marriage, entered into in Louisiana, is recognized merely as a state of concubinage." *Succession of Marinoni*, 177 *La.* 592; 148 *So. Rep.* 888. But, by force of articles 117 and 118 of the Code, the civil effects of a valid marriage are attributed to a null marriage, if contracted in good faith. This is termed a "putative" marriage. "Good faith" is defined as "an honest and reasonable belief" by one or both of the parties that the marriage was valid and without legal impediment. *Smith* v. *Smith*, 43 *La. Ann.* 1140; 10 *So. Rep.* 248. "Good faith" may proceed as well from an error of law as from an error of fact. *Jones* v. *Squire*, 137 *La.* 883; 69 *So. Rep.* 733; *Succession of Buissiere*, 41 *La. Ann.* 217; 5 *So. Rep.* 668; *McCaffrey* v. *Benson*, 40 *La. Ann.* 10; 3 *So. Rep.* 393. A putative marriage, so defined, produces the effects of a valid marriage in the period intervening between its celebration and the judicial declaration of nullity. When once such declaration intervenes, the marriage is without further effect, but the effects produced are not thereby extinguished. *Smith* v. *Smith, supra*. The decision in *Succession of Marinoni, supra*, turned on a question of pleading; and, when the case again reached the court for determination of the meritorious question, it was held that "A putative marriage is not founded on the actual marriage or the ceremonial marriage, but on the

reasonable belief by one or both of the parties that they were honestly married and that their offspring came from a lawful and honorable union." *Succession of Marinoni,* 183 *La.* 776; 164 *So. Rep.* 797. This interpretation was reaffirmed in *Succession of Dotson,* 202 *La.* 77; 11 *So. Rep.* (*2d*) 488. There, it was held that cohabitation "for several years," as a result of which children were born, "was inadequate of itself to establish a marriage" between the parties, and that neither a ceremonial nor a putative marriage was proved. Chief Justice O'Niell, while concurring in the decree, criticised the view that honest belief was the determinative of a putative marriage. He defined such a marriage as "one which has been solemnized with the accustomed ceremonials but which is in fact illegal for some reason;" and he voiced the opinion that the case of *Succession of Marinoni,* 183 *La.* 776; 164 *So. Rep.* 797, ought to be overruled as in direct conflict with the decision rendered in *Succession of Cusimano,* 173 *La.* 539; 138 *So. Rep.* 95.

Here, the state of the case discloses no evidence of a marriage in Louisiana, either actual or putative. The testimony relating to the marriage itself has not been certified as part of the case on appeal; and we are therefore remitted to the conclusions of the trial judge for the evidence on this issue. It is thereby revealed that appellant testified that on April 17th, 1937, she and decedent entered into an informal contract of marriage *per verba de præsenti* in the State of New Jersey, where they were then domiciled, and that matrimonial cohabitation followed immediately in this state and was continued in Baton Rouge, Louisiana, whither decedent journeyed two days later in the pursuit of his employment. This evidence, if founded in truth, establishes a valid common law marriage in New Jersey. It tends to show the requisite common intent and the immediate assumption of the marital relation. *Voorhees* v. *Voorhees,* 46 *N. J. Eq.* 411; *affirmed, sum nom. Collins* v. *Voorhees,* 47 *Id.* 315; *Atlantic City Railroad Co.* v. *Goodin,* 62 *N. J. L.* 394; *Chamberlain* v. *Chamberlain,* 68 *N. J. Eq.* 736; *Jackson* v. *Jackson,* 94 *Id.* 233. The statute outlawing common-law marriages was not enacted until 1939. *Pamph. L., p.* 624; *N. J. S. A.* 37:1–10. The

trial judge found as facts that decedent left for Baton Rouge on April 19th, 1937, "after having spent two nights at the home" of appellant, and that thereafter, and until his death, he and appellant openly cohabited as husband and wife in Baton Rouge, and he there avowed the marital status to neighbors, friends and his fellow servants. Thus, on appellant's own showing, the cohabitation in Louisiana was pursuant to a marriage alleged to have been contracted in New Jersey. -

And herein the trial judge misdirected himself in matter of law. In the process of determining whether the agreement made in New Jersey constituted a common-law marriage, or was merely *per verba de futuro,* he said: "Therefore the court will consider only such acts of habit and repute as occurred within this jurisdiction." This evinces a misapprehension of fundamental principle.

Cohabitation and reputation raise a presumption of a preceding marriage. Since law reflects the common experience and the common standard of morality, and therefore commands and receives common respect and adherence, there is a presumption of marriage rather than concubinage. And the strength of the presumption is in direct ratio to the length of the cohabitation. "Every intendment of the law leans to matrimony." *Bishop on Marriage, Divorce and Separation,* §§ 77, 956. Therefore, proof of cohabitation and reputation in Louisiana was indisputably admissible as corroborative of appellant's testimony of a common law marriage in New Jersey. *Smith* v. *Smith,* 52 *N. J. L.* 207; *Bey* v. *Bey,* 83 *N. J. Eq.* 239; *Voorhees* v. *Voorhees, supra.* There is an essential difference between the use of this element in corroboration of a common law marriage in New Jersey and as independent proof of marriage under the laws of Louisiana. Even in that state, as has been shown, long cohabitation and reputation serve to create a presumption of a preceding marriage, not necessarily one contracted there; and a valid common-law marriage contracted elsewhere is there recognizable and enforceable. *Honore* v. *Jones,* 180 *La.* 109; 156 *So. Rep.* 191, 193; *Gibbs* v. *Illinois Central Railroad Co.,* 169 *La.* 450; 125 *So. Rep.* 445. The law views marriage as

a civil status arising out of a contract that is *sui generis*. High public policy denies to such certain characteristics of the ordinary contract, notably the right of termination by mutual consent. Marriage is the genesis of the family, and the family is the unit of our society. The status is *juris gentium*. The validity of a marriage is determined by the *lex loci contractus*. A marriage contracted in New Jersey in accordance with our laws is valid everywhere. *Capossa* v. *Colonna*, 95 *N. J. Eq.* 35; *affirmed,* 96 *Id.* 385.

It results that the rejection of cohabitation and reputation in Louisiana as factors relevant to the inquiry as to whether a common-law marriage had been contracted in New Jersey constituted error prejudicial to appellant's substantial rights.

The judgment is accordingly reversed, and a new trial awarded; costs to abide the event.